**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES PERRIN,** | : | |
| **Plaintiff,** | : | **Case No. 2:08-cv-748** |
| **v.** | : | **Judge Holschuh** |
| **COLUMBUS POLICE DEP'T, et al.,** | : | **Magistrate Judge Abel** |
| **Defendants.** | : | |
| | : | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendants' Motion for Summary Judgment. (Doc. 24.) For the reasons that follow, this motion is granted.

### I. Background

In the early hours of January 3, 2008, Marshaun Clark was robbed at gunpoint along East 26th Street in Columbus, Ohio. Clark found two police officers on routine patrol and told them of the robbery. The officers, James Howe and Adam Hicks, took Clark's description of the gunman—a short, black male wearing a blue coat—and, after asking Clark to wait behind a gas station, proceeded to the location Clark gave of the robbery, 1301 East 26th Street. Both officers recognized the address as one known for prior drug activity.

Upon arriving at the house, the officers recalled being there a few months before for an arrest in which a loaded shotgun was found covered by a blanket under the arrestee. With both this and Clark's claim that he had just been robbed at gunpoint at this location in mind, both officers drew their guns as they exited their cruisers. Officer Hicks went to the front of the house to knock on the

1

door, while Officer Howe went south along the east side of the house to the backyard to make sure that the suspect did not flee in that direction. Officer Hicks knocked hard on the front door and yelled "Police!", moving quickly at this point to take cover by a tree. He then saw some lights at the front of the house and heard what sounded like someone moving quickly through the house.

Positioning himself in the backyard at the southeast corner of the house, Officer Howe heard Officer Hicks knock on the door and yell "Police!" A few seconds later, Officer Howe saw the back door of the house open and a short, black male in a blue coat step outside onto the back porch. Officer Howe shouted for the individual to "get on the ground" and show his hands. The individual, who had his back to Officer Howe, did not follow these commands, however, and instead turned to his left and looked over his left shoulder at Officer Howe, who then repeated his commands. At this point, according to Officer Howe, the individual looked as though he was about to run westbound off the porch. Back at the front of the house, Officer Hicks heard Officer Howe yell at the suspect and began to run to the backyard along the west side of the house.

Instead of complying with Officer Howe's command, the individual hesitated and turned back toward Officer Howe a second time. Officer Howe then saw a chrome handgun in the suspect's left hand, pointing down at the suspect's side, so he quickly moved to get cover by another nearby tree. Officer Howe shouted "Drop it! Drop it!" The suspect again did not comply, however, and Officer Howe states that the suspect began to raise his gun at him. Affidavit of James Howe, ¶ 12. Believing that the suspect was about to shoot him, Officer Howe quickly fired four shots at the suspect, who threw his gun in the southwest portion of the backyard as Officer Howe fired his final shot.

Officer Hicks observed much of this. He had heard Officer Howe yell "Drop it! Drop it!" as he was running and, upon arriving at the southwest corner of the house, he saw a man matching the suspect's description wearing a blue coat standing on the back porch with a gun in his hand. Officer Hicks then saw the suspect raise the gun toward the backyard. Although Officer Hicks could not see Officer Howe right away, he knew that Officer Howe had gone to that area and, having heard him yell from that area, Officer Hicks believed the suspect was going to shoot Officer Howe. Upon hearing gunshots, which he states he thought were being fired by the suspect, Officer Hicks fired his own gun at the suspect four times, after which he saw the suspect collapse on the porch. Affidavit of Adam Hicks, ¶¶ 8–9.

Perrin describes the shooting somewhat differently. He admits that he heard a police officer yell for him to drop his gun, but he states that he did not know where any officer was located in the backyard. He also claims that he only raised his gun in his attempt to throw it away in the backyard. In his deposition, he described the whole scene as follows:

> Q. . . . From the point you stepped out on the porch, everything then at that point happened very, very quickly, didn't it?
> A. Yes, sir.
> Q. And I want you to tell me then, was the gun in your left hand?
> A. Yes, sir, it was.
> Q. When you heard—what did the officer yell?
> A. From my memory: Police, drop it. But by the time he said that, my hands was already in the motion of letting the firearm go.
> Q. You looked at him, didn't you?
> A. No, sir.
> Q. You never saw a police officer?
> A. No, sir.
> Q. Okay. And you heard: Police, drop it?
> A. Yes, sir.
> Q. Right?
> A. But at that point, by the time the officer was saying drop it, I was already discarding the weapon.

Q. And you thought it was a police officer, right?

A. If he yells: Police.

Q. Yeah, but the person that yelled: Police, drop it, you believed to be a police officer, right?

A. Yeah, because I don't know anybody around the neighborhood who would yell like that.

Q. Well, I'm just asking that day, when you heard: Police, drop it, you did believe a police officer was yelling that, correct?

A. Yes, sir.

Q. Now, were you facing straight to the back yard at that point? Were you facing to the right? Were you facing to the left?

A. I was still on the same angle of southwest.

Q. So still facing a little bit to the left?

A. Yes.

Q. And where was your gun?

A. Gone by then.

Q. No, but you had the gun to start, right?

A. Right.

Q. Okay. So where was the gun when you heard the officer yell: Police, drop it?

A. In mid air, I guess. I don't know.

Q. Well, was it in your hand?

A. Oh, yes, it was in my hand.

Q. So let's start with in your hand. You didn't drop it, did you?

A. No, sir.

Q. You knew the person told you to drop it, but you did not drop it?

A. Correct.

Q. Okay. So with the gun to your side, where did your hand and the gun go?

A. Up.

Q. Okay. Did it go up, straight up, over, sideways? You've got to help me with this.

A. It went straight up and out on the angle that I was standing.

Q. But you did bring the gun up?

A. Yes, to discard it.

Q. Okay. But you brought the gun up. How high did you bring it up?

A. I don't know how high it was by the time it left my hand.

Q. Was it waist level? Was it higher than that?

A. I just know I threw it and threw my hands up.

Q. And had the shooting already started while you were bringing the gun up?

A. Yes, sir.

4

*　*　*

> Q.　. . . But you do remember that your hand was coming up while shots were being fired, correct?
> A.　In a southwest direction, yes.
> Q.　Yeah, okay. And you don't know how high your hand got with the gun before it left your hand?
> A.　No, sir.

Deposition of James Perrin, 57–61. Reading these statements closely, Perrin claims that he began to throw his gun away before hearing Officer Howe yell for him to "Drop it!", but he also acknowledges that he still had the gun in his hand at the time of the command. What is absolutely clear from his account, however, is that he raised his gun toward the backyard at the time of the shooting, after he had heard the command to drop the gun and had failed to drop it.

After the shooting, both officers approached the suspect, who had been shot multiple times. Officer Hicks, who, unlike Officer Howe, had not seen the suspect throw the gun into the backyard, noticed at this point that the suspect no longer had a gun in his hands. The suspect was handcuffed and other officers began to arrive when Officer Howe saw an upstairs light turn off, which led him to believe the house was still occupied and that their current location was not entirely safe. As a result, the officers carried the suspect to the front of the house and Officer Howe called for medical help for the suspect. Once the medics arrived, however, they had to be kept a few houses away until the officers were confident that a threat was no longer presented by anyone on the property. Rather than wait for the property to be secured to allow the medics to treat the injured suspect in front of the house, the officers decided to take the suspect to the waiting medics.

The suspect was given medical attention and survived the shooting. His identity was determined to be James Perrin, the plaintiff in this case, and he was charged with Aggravated Menacing in state court, which was reduced to one count of Menacing. The court found Perrin guilty based on the facts alleged by the prosecution, that "[t]he suspect was armed with a handgun [and] pointed th[e] handgun at the officers, knowingly causing them to believe that he would cause them harm." Transcript of Proceedings before the Honorable H. William Pollitt, Jr., Franklin County Municipal Court, Case Nos. 2008 CRB 000262; 2007 TRD 184709, July 22, 2008. He is now incarcerated at the Noble Correctional Institution.

Perrin filed this lawsuit on August 6, 2008 under 42 U.S.C. § 1983 for what he claims was an unreasonable use of force by the police officers. Specifically, he has sued Officer Hicks, Officer Howe, and the Columbus Division of Police. All three defendants have filed a motion for summary judgment.

## II. Summary Judgment

### A. Applicable Law

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . .

[for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157–60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48 (emphasis in original). A "material"

fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter

summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. <u>Anderson</u>, 477 U.S. at 251–52; <u>Lansing Dairy, Inc.</u>, 39 F.3d at 1347.

## B. Discussion

Among other defenses, the defendants have asserted qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985), qualified immunity should be resolved "at the earliest possible stage in litigation," <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam). <u>See also</u> <u>Pearson v. Callahan</u>, 129 S.Ct 808, 815 (2009).

The Supreme Court has set out a two-prong test for cases of qualified immunity. <u>See Pearson</u>, 129 S.Ct at 818 (2009). Immunity may only be lost by an official where the court finds (1) that a constitutional right has been violated and (2) that right was "clearly established" at the time of his or her actions. <u>Id.</u> at 815–16 (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)). Although the court need not decide the first prong before proceeding to the second, it may do so if it wishes, and it remains clear that a defendant may not be held liable unless both of these prongs are met. <u>Id.</u> at 818. Because the case here is most easily resolved by considering whether the defendants violated Perrin's constitutional rights, the Court will address this issue first rather than asking whether the right at issue was clearly established at the time of the shooting.

The Fourth Amendment does permit the use of deadly force in apprehending a suspect, Tennessee v. Garner, 471 U.S. 1, 7, 11 (1985), and claims for an unreasonable use of force by the police are judged under differing standards depending on the status of the individual subjected to the use of force at the time the events occurred. Here, the actions in dispute were taken against a citizen in the course of an arrest, so the Fourth Amendment's "objective reasonableness" standard applies. Graham v. Connor, 490 U.S. 386, 394–95 (1989); Leary v. Livingston County, 528 F.3d 438, 443 (6th Cir. 2008). Under this standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. "Determining whether the force used to effect a particular seizure is 'reasonable' . . . requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (internal quotations and citations omitted).

In this context, the Fourth Amendment's "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Garner, 471 U.S. at 8–9). Furthermore, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly-evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97. And deadly force may be used only if "the officer has probable cause to

believe that the suspect poses a threat of serious physical harm, either to the officers or to others."

Garner, 471 U.S. at 11; Williams v. City of Grosse Pointe Park, 496 F.3d 482, 487 (6th Cir. 2007)

("[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation,

has probable cause to believe that a suspect poses a serious physical threat either to the police or

members of the public.").

The Sixth Circuit has focused the review a district court must undergo when considering a

claim for unreasonable use of force brought under the Fourth Amendment by requiring the court to

undertake a segmented analysis, in which it considers only the seizure itself, and not the events

leading up to the seizure: "The proper approach . . . is to view excessive force claims in segments.

That is, the court should first identify the 'seizure' at issue here and then examine 'whether the force

used to effect that seizure was reasonable in the totality of the circumstances, not whether it was

reasonable for the police to create the circumstances.'" Livermore v. Lubelan, 476 F.3d 397, 406

(6th Cir. 2007) (citing Dickerson v. McClellan, 101 F.3d 1151, 1161 (6th Cir. 1996)).

Balancing the "nature and quality of the intrusion" on plaintiff's Fourth Amendment interest

against the right of police officers to use deadly force when their lives and lives others may be in

jeopardy, this Court believes that the defendants are entitled to summary judgment on plaintiff's

claims of the use of unreasonable force by Officers Hicks and Howe. It is clear, of course, that the

seizure was the shooting of Perrin and that Perrin's interest in his life is a fundamental interest.

Garner, 471 U.S. at 9. But, as is explained below, in the totality of the circumstances, and applying

the Graham factors, this interest is clearly outweighed by the officers' interest in their own lives, and

Perrin's right to be free from the unreasonable use of force therefore has not been violated.

Additionally, the Columbus Division of Police is shielded from liability by municipal immunity.

Monell v. Department of Social Services, 436 U.S. 658, 691 (1978).

## 1. Officer Hicks and Officer Howe

In their Motion for Summary Judgment, defendants have met their burden of showing that no genuine issue of material fact exists as to the reasonableness of the officers' actions. Leary, 349 F.3d at 897. They have shown that Officer Howe's use of deadly force against Perrin was not unreasonable, because at the moment Officer Howe fired at Perrin, Perrin had just raised his gun, which gave the officer reason to believe that he was at immediate risk of being shot by Perrin. Howe aff., at ¶ 12. This posed a very serious and imminent threat of harm to Officer Howe and anyone else who might have been in the area, and it causes the "immediate threat" factor in the Graham analysis to weigh in favor of Officer Howe. Furthermore, the other Graham factors—the severity of the crime at issue and whether the suspect is actively resisting or attempting to evade arrest—also weigh in favor of Officer Howe. Perrin refused commands to get on the ground and drop his weapon, and Officer Howe testified that even as he yelled these commands, Perrin hesitated and appeared to be prepared to run off the porch in an attempt to escape, gun in hand, which indicate a willingness to evade arrest. Id. at ¶¶ 11–12. Additionally, the crime he was suspected of having committed was armed robbery, a very serious offense. Given these facts, Officer Howe's use of force was objectively reasonable under the totality of the circumstances, and outweighs Perrin's interest against the intrusion. See Graham, 490 U.S. at 396.

Officer Hicks testifies that he ran towards the back of the house once he heard Officer Howe yell for the suspect to "get on the ground," and upon arriving at the back of the house he saw Perrin raise his gun toward the backyard, thereby posing a serious threat of harm to anyone in that area. Id. at ¶ 8–9. Indeed, because Officer Hicks knew that Officer Howe had gone to the backyard when they

arrived, Officer Hicks feared that Perrin was going to shoot at Officer Howe. Id. at 9. Almost immediately thereafter, several shots rang out, and Officer Hicks, believing the shots to have been fired by Perrin, shot at Perrin. Id. Although he did not know with certainty from whose gun those shots were fired, he did know that a serious situation had just rapidly devolved into an emergency situation in which the life of his partner, his own life, and that of anyone else who may have been in the area were at risk. In such dangerous circumstances, the use of deadly force is justified and reasonable, especially given the seriousness of the crime that Perrin was suspected of having just committed. Just as with Officer Howe's claims, the Graham factors support Officer Hicks' use of deadly force.

With this, the burden is now shifted to Perrin to point out a genuine issue as to a material fact. Celotex, 477 U.S. at 322. He must point to the existence of at least one material fact that would allow a reasonable jury to find in his favor. Id.; Anderson, 477 U.S. at 252. Perrin has sought to avoid summary judgment on several grounds. For the reasons that follow, however, each of these fails.

First, Perrin points to alleged shortcomings in Officer Howe's testimony. Perrin points out that Officer Howe never stated that he believed Perrin had concealed the gun upon exiting the house and moving onto the back porch. Because of this, Perrin claims, if he had come out of the house with a gun in his left hand, Officer Howe should have seen it at that point. Declaration of James Perrin, at ¶ 2.

The inference Perrin wants to be drawn from this claim is that Perrin did not have a gun in his hands when he exited the rear of the house, because if he had Officer Howe would have seen it right away and stated as much in his affidavit. Whatever may be the reason for the absence of a

statement in Officer Howe's affidavit that he either did or did not see a gun in Perrin's hand at the very moment Perrin came out the back door, it is not a material fact upon which a denial of summary judgment may be based. Officer Howe <u>did</u> <u>see</u> a gun in Perrin's left hand at some point after he exited the house, and it was as a result of this that Officer Howe ordered Perrin to "Drop it! Drop it!" Officer Howe clearly testified that he opened fire only when Perrin began to raise the gun at Officer Howe, giving him a well-founded fear that he was about to be shot by Perrin.

<u>Second</u>, Perrin claims that he was not given enough time to surrender by the police once he exited the house. Specifically, he relies on statements he claims were made by an individual inside the house at the time of the shooting. Without identifying any particular statement in detail, Perrin claims that the individual heard shots "[j]ust at th[e] time" Perrin went out the back door.  Decl., at ¶ 2.

As an initial matter, this statement is far too vague to determine whether a factual dispute does exist between Perrin's version of events and the officers'. Being an out of court statement submitted to show the truth of the matter asserted, it is also hearsay, which may not be considered on summary judgment. <u>Pack v. Damon Corp.</u>, 434 F.3d 810, 815 (6th Cir. 2006); <u>Jacklyn v. Schering-Plough Healthcare Products Sales Corp.</u>, 176 F.3d 921, 927 (6th Cir. 1999).

Even if it were admissible, however, the focus is more properly on whether, at the time the officers fired their weapons, they each had a reason to believe that doing so was necessary to prevent death or serious bodily injury to themselves or others. <u>Graham</u>, 490 U.S. at 397; <u>Chappell v. City of Cleveland</u>, 585 F.3d 901, 912 (6th Cir. 2009). Indeed, in <u>Chappell</u>, the Sixth Circuit noted that:

> Although it may be fair to say there is no evidence that [the decedent], in the unknown inner workings of his mind, had sufficient time to comply, the record shows there was sufficient time for the detectives to make observations of [the decedent's] actions—actions

that, viewed objectively, strongly indicated his intentions were not innocent and compliant, but defiant and hostile. And ultimately, of course, the objective reasonableness of the detectives' conduct must be measured in light of what they actually observed in the circumstances confronting them, not in light of speculation that may arise with the benefit of hindsight.

585 F.3d at 912. Given this focus, the out of court statement is not relevant to the propriety of the officers' actions because it sheds no light on whether the officers observed an immediate threat of serious harm.

Third, Perrin alleges that there were no shell casings found in the area where Officer Howe was standing in the backyard. This, he argues, calls into question the location of Officer Howe at the time he fired his gun at Perrin. Decl., at ¶ 2. He also argues that, in a larger sense, it calls into question the veracity of all of Officer Howe's statements. Id.

The fact that no shell casings were found in the exact spot where Officer Howe recalled he was standing when he fired at Perrin is not material to the issue here: whether, at the time Officer Howe fired his gun, he had reason to believe that his or another person's life was in danger. See Graham, 490 U.S. at 397. Perrin has not disputed Officer Howe's claim that Perrin raised his gun. Indeed, Perrin even acknowledged in his deposition that, although he did not know where either officer was located, he did raise his gun up toward the backyard in his attempt to throw the gun into the backyard. Depo., at 57–61. Whatever Officer Howe's exact location at that time, Perrin's act of raising his gun, even if done unintentionally or in an attempt to discard the gun, justified Officer Howe's use of force as he could, quite understandably, have perceived this as an immediate threat to his or another person's safety. As a result, the fact that no shell casings were found in the exact area in which Officer Howe recalls he was standing when he fired his weapon does not create a genuine issue of material fact.

Fourth, Perrin points to two statements made by the officers regarding the direction in which Perrin threw his gun and the distance in which he threw it. Decl., at ¶ 3. First, in his affidavit, Officer Howe claims that Perrin pointed his gun in his direction in the southeast portion of the backyard. Howe aff., at ¶ 12. Second, in "Tape recorded statements from January 15, 2008," which are not in the record, Officer Hicks allegedly stated that the gun was found approximately 10 feet from the back porch. See Decl., at ¶ 3. From these Perrin argues that if he was, as Officer Howe claims, facing the southeast, then the gun should have been found in the southeast, rather than where it was found, the southwest portion of the backyard. Additionally, Perrin argues that despite Officer Hicks' claim that the gun was found ten feet away from the back porch, it was in fact found 23 feet away.

Neither the direction in which the gun was thrown nor the distance in which it was thrown (10 feet or 23 feet) is material to the question here. As with his earlier claims, Perrin has not disputed that he raised his gun after hearing an officer yell for him to drop it. Depo., at 59. Indeed, as stated earlier, Perrin admits that he raised the gun toward the backyard in his attempt to throw it away without knowing where the officers were located. See depo., at 58–61. This gave the officers reason to believe their lives were in danger and that it was necessary to use deadly force to avoid this danger. Perrin's allegations regarding the direction and distance in which the gun was thrown therefore do not create genuine issues of material facts that would prevent the granting of summary judgment to Officers Howe and Hicks.

Fifth, Perrin points to Officer Hicks' statement in his affidavit that when he arrived at the backyard and heard shots, he believed they were coming from Perrin. Decl., at ¶ 4. Perrin then argues that a jury could find that Officer Hicks had no knowledge of where the shots came from, or even if they were gunshots in the first place, as opposed to something else, such as a car backfiring,

for example. Id.

The fact that Officer Hicks did not know, with absolute certainty, that the sounds he heard were, in fact, gunshots coming from Perrin and not Officer Howe must be considered in the totality of the circumstances. Officer Hicks heard Officer Howe yell "Drop it! Drop it!" and believed he saw a man matching the suspect's description on the porch holding a gun, and that he raised the gun toward the back yard where Officer Hicks knew Officer Howe was located. Police officers are often required to make split-second judgments in tense situations such as this without all the pertinent facts that may be available to one reviewing the situation with hindsight. Graham, 490 U.S. at 396–97. Although Officer Hicks may not have known with certainty whether the gunshots were being fired by Perrin or Officer Howe, he has stated that when he fired his gun, it was his "belie[f] that the suspect was shooting at Officer Howe . . . ." Hicks aff., at ¶ 12. To expect him to have conducted a closer investigation rather than make the split-second decision to fire at Perrin would have exposed either him or Officer Howe, or both, to greater danger, as there was no guarantee that Perrin was not going to open fire in return. Thus, the fact that Officer Hicks did not know for sure who had fired the first shots does not create a genuine issue as to any material fact regarding the reasonableness of Officer Hicks' use of force.

Sixth, Perrin claims that it would have been impossible for Officer Hicks to have seen the gun in Perrin's left hand at the time it was raised toward Officer Howe, given the positioning of Perrin's body in relation to Officer Hicks. Decl., at ¶ 4. While it may be argued that Officer Hicks could not have seen a gun in Perrin's left hand, it is undisputed that Officer Hicks saw someone matching the suspect's description on the back porch of the house and that he had just heard Officer Howe yelling at the suspect to "Drop it! Drop it!" Hicks aff., at ¶ 8. These facts provided Officer

Hicks with a strong reason to believe that the individual was the suspect in the recent armed robbery, and that he was still armed. Furthermore, Officer Hicks did not fire his weapon until he had heard gunshots, which he "believed . . . to be [of] the suspect shooting at Officer Howe." Hicks aff., at ¶ 9. These facts alone justify Officer Hicks' use of force. Whether he could have, as he claims, seen the gun itself in Perrin's hand given the relative positions of their bodies may be arguable, but it does not present the kind of material fact issue that prevents summary judgment for the defendants.

Seventh, Perrin points to another statement allegedly made by Officer Hicks in "Tape-recorded statements on January 15, 2008." Decl., at ¶ 5. In the statement, Officer Hicks says "I hear Officer Howe yelling, 'Drop it, drop it' and that's when I see the uh, Mr. Perrin raise a gun on me." Id. Perrin also points to the statements made by Officer Howe in which he claimed to have seen Perrin raise the gun toward him. Id. From these two, Perrin asserts that a genuine issue of material fact is created by virtue of the fact that the officers' statements, taken together, would require Perrin to have pointed his gun in two different directions at the very same time. Id. Although the Court admits that the statements may not be completely harmonious, no issue of material fact exists on this issue because the officers' actions were objectively reasonable under any set of facts supported by these statements.

As an initial matter, the events surrounding this incident unfolded very rapidly and at night, and it is undisputed that Perrin was facing the southwest at the time he looked over his shoulder in Officer Howe's direction in the southeast. It is also undisputed that Perrin raised his gun in some direction after ignoring Officer Howe's order to drop it, though he claims he only raised the gun to throw it away. Depo., at 58–59.

Furthermore, the officers' use of force was justified so long as Perrin's actions gave each a reason to believe that there was an immediate danger of serious physical harm, City of Grosse Pointe Park, 496 F.3d at 487, and it is clear from the record that, under any of the sets of facts alleged, the officers were justified in their beliefs regarding the need to use deadly force. Whether Perrin raised his gun to point it directly at either officer, or whether he simply raised it toward the backyard without knowing where the officers were located as he threw it away, both officers, upon observing the mere act of raising the gun up toward the backyard, had a reason to believe that they needed to use deadly force to prevent serious harm from possibly being inflicted on themselves or their fellow officer. The disputed facts pointed to by Perrin are thus immaterial.

Perrin also points to the fact that Officer Howe was "protected by a big tree and had on dark colored clothing" at the time of the shooting, perhaps suggesting that Officer Howe should have been required to hide behind the tree rather than open fire at Perrin. Decl., at ¶ 5. The existence of a tree to hide behind and the fact that Officer Howe's dark clothing may have made it harder for Perrin to hit Officer Howe had he shot at him do not, however, render Officer Howe's use of force against Perrin unreasonable. The Court is aware of no requirement that officers are forced to hide and not use active force to protect their lives and the lives of others whenever a suspect gives them a reason to believe they are facing an immediate risk of serious physical harm. Nor is a suspect permitted "one free shot" at an officer before that officer may use deadly force. Indeed, as mentioned, "an officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public." City of Grosse Pointe Park, 496 F.3d at 487. See also Garner, 471 U.S. at 11. Additionally, Officer Howe has clearly stated that he did attempt to get cover behind a

tree at the time Perrin raised his gun at him. Howe aff., at ¶ 12. Officer Howe's use of force was objectively reasonable.

Eighth, Perrin points again to Officer Hicks' "Tape-recorded statement on January 15, 2008" to make the argument, for a second time, that Hicks did not have probable cause to open fire because he allegedly stated that he did not see a blast come from the muzzle of Perrin's gun and that he "was not 100% sure that it was the plaintiff shooting." Decl., at ¶ 6. As explained above, however, Officer Hicks has clearly stated that he saw the suspect raise his gun up toward the backyard, and that he "believed the suspect was going to shoot Officer Howe," and once he heard shots, he "believed the gunshots to be the suspect shooting at Officer Howe." Hicks aff., at ¶ 9. The fact that he did not see, with certainty, a shot fired from Perrin's gun or that he was not certain the gunshots were coming from Perrin is immaterial. Looking at the entirety of the record, and at the threat he observed, Officer Hicks' use of force was justified.

Ninth, Perrin claims that he was shot "almost immediately upon exiting the residence" and that the officers did not give him time to comply with their orders before shooting at him. Decl., at ¶ 7. This argument is similar to an earlier one, discussed above, in which Perrin pointed to a statement allegedly made by another individual inside the house at the time who stated that Perrin was shot almost immediately after leaving the house. As with that earlier claim, this one fails to establish the existence of a genuine issue of material fact. The relevant inquiry is not whether the length of time given for Perrin to drop his weapon, after refusing to do so, was a reasonable period of time; it is whether, given the totality of the circumstances faced by the officers at the time they each fired their gun, it was reasonable for them to use deadly force against Perrin. See Graham, 490 U.S. at 397; Chappell, 585 F.3d 901, 912 (6th Cir. 2009).

Perrin does not argue that the officers could not have perceived the threat from him that they claim they did in the time after he stepped out the back door of the house. Indeed, Perrin did bring a gun with him out of the back door of the house after the police had arrived to investigate the armed robbery he had just committed. He has also acknowledged that at that point he heard a voice he knew to be of a police officer yell for him to drop his gun, which he did not do. Depo., at 58–59. All parties also agree that Perrin raised his gun up at approximately that same time. Id.; Howe aff., at ¶ 12; Hicks aff., ¶¶ 8–9. While Perrin claims that he meant no harm to the officers and that he was simply trying to discard his gun, such actions can understandably cause a police officer to perceive a deadly threat, especially when the situation unfolds quickly and when it occurs at night. Looking at the totality of the circumstances, the officers' perceptions of an immediate threat that called for the use of deadly force were reasonable.

Tenth, and lastly, Perrin has claimed in his Complaint that he never heard the officers identify themselves as the police when they first arrived at his house and that he went to the back door with his gun to protect his family. Compl., at 3. This, however, does not create a genuine issue of material fact as to the reasonableness of the officers' use of force because reasonableness is to be determined at the time the officers used the force. Livermore, 476 F.3d at 406 (noting the requirement of a segmented analysis in excessive force claims). The reasonableness of the officers actions that created the circumstances leading up to the use of force is irrelevant. Id.; Dickerson v. McClellan, 101 F.3d 1151, 1161–62 (6th Cir. 1996) (holding that the reasonableness of officers' actions is evaluated without reference to officers' conduct that may have created the circumstances necessitating the use of force). As stated above, the record clearly supports the finding that at the time the officers fired their weapons, they were justified in doing so under the Graham standard.

For these reasons, Perrin has failed to show that there is any genuine issue of material fact regarding the actions of Officers Hicks and Howe. Although there may be immaterial discrepancies in the parties' versions of how the rapidly occurring event took place, the undisputed facts show that the officers acted properly when in danger of their own lives from an armed person believed to have just committed an armed robbery. A reasonable jury could not find otherwise, and the officers' motion for summary judgment should be granted.

## 2. Columbus Division of Police

Perrin has also brought suit against the Columbus Division of Police. It is well established, however, that municipal entities are immune from suit absent a showing of a custom or policy that caused a constitutional violation. Monnell v. Dep't of Social Services, 436 U.S. 658, 694 (1978); Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005). Perrin has failed to allege facts that establish the existence of any custom or policy within the Division of Police that caused the officers' use of force against him, which in any event was reasonable. As a result, his claim against the Division cannot survive summary judgment.

### III. Conclusion

For these reasons, defendants' Motion for Summary Judgment (doc. 24) is **GRANTED**.[1]

### IT IS SO ORDERED.

Date: __March 4, 2010__                                          __/s/ **John D. Holschuh**____
                                                                John D. Holschuh, Judge
                                                                United States District Court

---

[1]Perrin has also filed a Motion to Compel Discovery of Evidence And/Or Motion Requesting to Receive Documents from the Court in which he requests that defendants provide him with a second copy of discovery because his original copy has been lost. (Doc. 38.) Defendants have stated in their Response that they would send these documents to Perrin by February 19, 2010. (Doc. 39.) The Court presumes that this information has been furnished. In any event, this Motion does not affect the Court's ruling on the Motion for Summary Judgment because the briefing on the summary judgment motion was finished before Perrin lost the documents on August 13, 2009. (See Doc. 30.) In light of these facts, the Motion to Compel (doc. 38) is **DENIED** as moot.